# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 87349-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| NURBOL ISSATAYEV, | |
| Appellant. | |

FELDMAN, J. — On May 27, 2024, Nurbol Issatayev punched and stabbed his roommate, Anton Shoia, and attempted to stab his other roommate, Mykhailo Skrypnichenko. Based on these events, Issatayev was charged with and convicted of two counts of second degree assault, both with domestic violence and deadly weapon aggravating factors, and one count of fourth degree assault with a domestic violence aggravating factor. Issatayev appeals his convictions and asserts that improper witness testimony and the presence of custody officers in the courtroom during his trial prejudiced his right to a fair trial and that the trial court abused its discretion by denying his second motion for a mistrial based on these alleged trial irregularities. Because Issatayev has not established a substantial likelihood that any potential prejudice resulting from these alleged irregularities affected the jury's verdict, we affirm.

I

A

In spring 2024, Skrypnichenko lived in an apartment in Lynnwood and advertised on Facebook for a roommate to share the apartment with for the remaining two months on the lease. Issatayev responded to the advertisement and moved into the apartment on May 1, 2024. Soon thereafter, Skrypnichenko made plans to move into a nearby house at the end of May and Issatayev agreed to take over the apartment's lease and to find another roommate. When Issatayev advertised on Facebook for a new roommate, Shoia responded and moved into the apartment on May 26, 2024. On May 27, 2024, Shoia prepared dinner for the roommates and provided beer and vodka. Issatayev's friend from Kazakhstan also joined the group for dinner.

At trial, Shoia, Skrypnichenko, and Issatayev provided very different accounts of the subsequent events that evening. Shoia testified that he, Issatayev, and Issatayev's friend had been drinking together before dinner and that Issatayev and his friend had also been smoking cannabis. The atmosphere in the apartment was "very friendly," and after dinner Shoia sat on the couch looking at his phone while Skrypnichenko and Issatayev's friend went to the balcony to smoke. According to Shoia, Issatayev sat next to him on the couch, put his arm around his shoulder, asked him how he was, and stabbed his left leg with a knife, causing a cut to his superficial femoral artery that required surgery. Shoia pushed Issatayev away and saw that he was holding a white knife with a green handle. Shoia ran to the balcony doorway and told Skrypnichenko and Issatayev's friend that Issatayev

had cut him. Issatayev's friend left the apartment, Skrypnichenko went to his room to get a phone, and Shoia went to the kitchen.

Once in the kitchen, Shoia realized that he had lost a lot of blood, began to feel dizzy, and heard noises like yelling or knocking in the apartment. Issatayev entered the kitchen and apologized to Shoia. When Shoia rejected Issatayev's apology and "told him where he should go," Issatayev punched Shoia on his left cheek. Shoia punched Issatayev back and the two began to wrestle. Shoia wrestled Issatayev to the floor and tried to hold him down, but Issatayev ran away when Shoia began to lose consciousness. Shoia next remembered laying on the floor with first responders treating him.

Skrypnichenko, in contrast, testified that when he arrived at the apartment on May 27, 2024, both Shoia and Issatayev appeared intoxicated and Issatayev was aggressive and quarrelsome, which was not typical behavior for him. Skrypnichenko did not see Issatayev stab Shoia but did see Issatayev standing in the living room holding a green kitchen knife when Shoia appeared on the balcony. After this, Skrypnichenko went to his bedroom to find a bandage for Shoia's leg. Issatayev followed him into the bedroom and said, "brother, what have I done," and "what should we do." Skrypnichenko lost his temper and went to the kitchen to help bandage Shoia's leg. After helping Shoia, Skrypnichenko decided to call 911. This upset Issatayev who then entered Skrypnichenko's bedroom and tried to stab him with the green kitchen knife. Skrypnichenko pushed Issatayev out of his room and closed his bedroom door. Issatayev then hit the bedroom door with the knife.

Lastly, Issatayev provided yet another version of these events. He testified that he had stabbed Shoia in self-defense. Issatayev testified that he had commented on Shoia's cooking, which Shoia did not appreciate and which caused Shoia to swear at him. Issatayev asked Shoia why he was speaking to him that way, and Shoia responded with "a stream of expletives, profanities," including "Fuck your mother." Shoia moved toward Issatayev and asked him, "what do you want." Issatayev stood up, but Shoia pushed him back into a chair and the two began to fight. Shoia, who was larger than Issatayev, pushed him to the floor, punched him twice in the back of the head, and continued to hold him down and yell at him. To get away, Issatayev grabbed a small silver kitchen knife that Shoia had previously used while cooking and that was on the floor. He swung the knife and hit Shoia's leg, which caused Shoia to scream and grab his leg.

Issatayev testified that after he stabbed Shoia, he was out of breath and exhausted. When Skrypnichenko entered the kitchen and asked what happened, Shoia yelled that Issatayev had stabbed him with a knife. Skrypnichenko then punched or kicked Issatayev in the temple. When Issatayev got up, he heard Skrypnichenko speaking on the phone and he went to the bathroom and vomited. Skrypnichenko was watching him and would not let him get his phone or go back to his bedroom and told him that he was no longer welcome in the apartment. Issatayev left the apartment and was contacted by Sherrif's deputies.

Several deputies testified that they investigated and documented the scene (specifically the kitchen and living room areas) with photos but could not determine whether Shoia had been stabbed in the living room or the kitchen. Law

enforcement located outside the apartment on the grass beneath the balcony a green and white kitchen knife with a five-inch blade that appeared to be covered with blood. Deputy Jacob Olson with the Snohomish County Sherrif's Office detained Issatayev and transported him to the hospital because of his alcohol consumption. During transport, Issatayev was unruly and pushed on the partition that separated the front and the back of Deputy Olson's patrol vehicle causing it to creak and crack. Eventually, Issatayev was released from the hospital to Deputy Olson's custody and booked into jail. He remained in custody during the trial.

B

Issatayev was charged with two counts of second degree assault, both with domestic violence and deadly weapon aggravating factors, and one count of fourth degree assault with a domestic violence aggravating factor. Before trial, Issatayev filed a trial brief containing several motions in limine. Relevant here, motion in limine 10 requested that the trial court prohibit any mention or reference regarding Issatayev "attempting to kick a patrol vehicle window out upon arriving at the jail." Additionally, motion in limine 13 sought to preclude any mention of or reference to Issatayev "being booked into the jail and/or the fact that he remains in-custody." The trial court granted motion in limine 13 by agreement of the parties, and reserved its decision regarding motion in limine 10.

The court again addressed motion in limine 10 and issued its ruling regarding the motion during trial. The court concluded Issatayev's demeanor while being transported to the hospital by Deputy Olson was relevant "to show just the state of mind within a very brief amount of time after the incident itself."

Accordingly, the court permitted the State to elicit testimony regarding Issatayev "screaming and kicking and yelling in the car and the behavior upon immediate contact," but excluded "anything about trying to get out of handcuffs or what have you and anything at the hospital at this time." The court ruled that the State "can say this is how he behaved during the ride. He went to the hospital. He didn't appear to have any injuries, no injuries, didn't complain of any, and he was released." After defense counsel objected to the State eliciting testimony that Issatayev was released back to the deputy, the trial court directed the State to "[j]ust say he was released from the hospital."

After the court's ruling, the State began its direct examination of Deputy Olson. Deputy Olson testified that he drove Issatayev to the hospital and that Issatayev was behaving unruly while in the back of his patrol vehicle. When asked to elaborate on why he described Issatayev as unruly, Deputy Olson explained that

> he was pushing on the partition of my car, which separates the front seat from the backseat where prisoners go, hard enough in a way it was starting to creak and crack. And this is made out of like metal and plastic, and all my -- all my prisoners that I have transported or people that are in custody that I have transported, I have never heard someone push on it hard enough to make that kind of noise.

Deputy Olson then testified further that Issatayev appeared intoxicated.

Following this testimony, defense counsel asked to be heard outside the presence of the jury and moved for a mistrial based on Deputy Olson's use of the words "prisoner" and "custody." The State argued the jury did not hear any testimony that Issatayev had gone to jail or was in custody and that Deputy Olson merely spoke in "generalities." The trial court stated it "did not like the use of the

- 6 -

word 'prisoner,' because that has a whole different connotation," but concluded that Deputy Olson's testimony was insufficient grounds for a mistrial. The court offered to give a curative instruction directing the jury to disregard Deputy Olson's use of the word "prisoner" and "custody," but defense counsel declined the court's offer for a curative instruction.

Deputy Olson's direct examination continued as follows:

STATE: Why was he going to the hospital?

DEPUTY OLSON: For his alcohol consumption, presumed alcohol consumption.

STATE: And was he checked out by medical staff?

DEPUTY OLSON: Yes. He was seen by a doctor.

STATE: And after that, was he released back to you?

DEPUTY OLSON: Yes.

This concluded the State's direct examination of Deputy Olson.

When the court asked if the defense had any cross examination for the deputy, defense counsel again requested to be heard outside the presence of the jury and made her second motion for a mistrial. This motion for a mistrial was based on the elicited testimony that violated the court's ruling that the State was to "[j]ust say he was released from the hospital." The prosecutor apologized for violating the court's order, stating she "must have been turned around" and that she "thought that was what we had settled on." But the State maintained its position that Deputy Olson's testimony was not so prejudicial a mistrial was warranted. The court requested briefing on the motion and deferred its ruling.

The following morning, the defense filed the requested briefing in support of its second motion for a mistrial, arguing that Deputy Olson's use of the word "prisoner," other mentions of Issatayev's in custody status, and "the uniformed correction officers that have remained in the courtroom for the entirety of the trial" prejudiced Issatayev's right to a fair trial. The trial court denied the defense's motion, stating,

> I'm going to deny the motion for mistrial, as it indicated in the case law that even testimony that a defendant is in jail or has been in jail can be cured by a curative instruction, depending on the circumstances, I suppose.
>
> Here what we have is the deputy talking about prisoners generally in the back of his car, and then he changed that to people in custody, and then we have the prosecutor asking if the defendant was released from the hospital back into his custody. And then as Defense pointed out, we do have custody officers in the courtroom sitting in the back area on each side, and depending on how knowledgeable one is of the justice system, they might assume that the defendant is in custody, although I have certainly had jurors say before that they just assumed that officers were always present during trial. So I think it depends on the juror perhaps.
>
> Obviously there have been no handcuffs or shackles during this trial . . . When the prosecutor asked if Mr. Issatayev was released back to the officer's custody, I think jurors could have assumed that he was taken back somewhere else, since the officer drove him to the hospital. They didn't necessarily need to assume that he was being taken to the jail. And on the whole, under the circumstances, with the report from the two witnesses that Mr. Issatayev had stabbed one person and attempted to cut another, most jurors would assume there would be an arrest, if for no other reason than to separate the parties temporarily.

The court concluded that "any potential prejudice is minimal in this case" and agreed to give a curative jury instruction, which defense counsel drafted and which became jury instruction 5.

Issatayev was found guilty of all three charged offenses. At sentencing, the court imposed concurrent standard-range sentences of 39 months for the two second degree assaults and no additional time for the fourth degree assault. This timely appeal followed.

II

Issatayev argues the trial court erred in denying his second motion for mistrial. He claims that Deputy Olson's improper testimony and the presence of custody officers in the courtroom so prejudiced the jury that he was denied his right to a fair trial. We disagree.

"The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). "We review the trial court's denial of a mistrial for abuse of discretion, and we find abuse only 'when no reasonable judge would have reached the same conclusion.'" *Id.* (quoting *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)). "'In determining the effect of an irregularity, we examine (1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it.'" *Id.* (quoting *Hopson*, 113 Wn.2d at 284). "These factors are considered with deference to the trial court because the trial court is in the best position to discern prejudice." *State v. Garcia*, 177 Wn. App. 769, 776-77, 313 P.3d 422 (2013) (internal citations omitted).

The first factor—the seriousness of the irregularity—asks whether the irregularity was "serious enough to materially affect the outcome of the trial." *Id.*

at 777. Here, it was not. As the trial court noted, Deputy Olson's testimony was "about prisoners generally in the back of his car, and then he changed that to people in custody." At no point did he state that Issatayev was a prisoner or in custody. Nor did Deputy Olson's statement that Issatayev was released from the hospital to him indicate that Issatayev was going to be booked into jail that night or that he remained in custody during the trial. Instead, the testimony at trial merely established that Issatayev was transported to the hospital in Deputy Olson's patrol vehicle because he had consumed alcohol and that Deputy Olson was with Issatayev after he was released from the hospital.

Turning to the second factor—whether the alleged trial irregularity involved cumulative evidence—the jury had already heard testimony that Issatayev had attacked Shoia, had attempted to attack Skrypnichenko, and had been detained by law enforcement that evening. Consequently, regardless of the specific language Deputy Olson used during his direct examination, jurors could reasonably have assumed that Issatayev would be arrested based on Shoia's and Skrypnichenko's reports to law enforcement. On this record, the trial court correctly noted "most jurors would assume there would be an arrest, if for no other reason than to separate the parties temporarily."

Lastly, as to the third factor—whether the trial court properly instructed the jury to disregard the alleged irregularity—the trial court here gave a curative jury instruction. After the court denied the defense's second motion for a mistrial, it offered to instruct the jury to completely disregard Deputy Olson's testimony that Issatayev was released to him by the hospital. Defense counsel instead requested

the court provide the curative instruction at the conclusion of the trial along with the other jury instructions to draw "less attention to the issue." The court then permitted defense counsel to draft the curative instruction, which was included in the court's final instructions to the jury. That instruction states:

> You may consider evidence that the defendant was in handcuffs on the night in question only in considering the origin of any injuries the defendant may have had. You may not consider it for any other purpose.
>
> You may not consider any evidence that the defendant may have been "in custody" on the night in question for any purpose.
>
> Any discussion of the evidence during your deliberations must be consistent with these limitations.

This curative instruction "did not unduly emphasize the testimony," and we presume that jurors follow curative instructions and disregard improper evidence when so instructed. *Gamble*, 168 Wn.2d at 178.

The trial court's analysis also is also buttressed by the two cases that Issatayev cited in response to the trial court's request for briefing in support of his second motion for a mistrial and which Issatayev likewise cites in his appellate briefs: *State v. Condon*, 72 Wn. App. 638, 865 P.2d 521 (1993), and *State v. Christian*, 18 Wn. App. 2d 185, 489 P.3d 657 (2021). In *Condon*, a witness testified, in violation of a ruling in limine, that Condon was in jail. 72 Wn. App. at 648. The trial court granted Condon's motion to strike those comments, denied Condon's motion for a mistrial, and instructed the jury to disregard references that Condon was in jail. *Id.* On appeal, we stated the fact Condon had been in jail did not mean he was convicted of a crime. *Id*. at 649. We then concluded that even though the witness's improper statements had the potential for prejudice, they

were not serious enough to warrant a mistrial, and the trial court's instruction to the jury to disregard the statement was sufficient to cure any potential prejudice. *Id*.

More recently, we reached a similar holding in *Chistian.* There, similar to *Condon*, Christian moved for a mistrial based on the victim's testimony regarding his incarceration. 18 Wn. App. 2d at 196. That testimony violated pretrial rulings, and "[t]he State conceded to failing to instruct [the victim] not to mention Christian's current or previous incarceration. *Id*. at 195-96. Applying the test set forth in *Hopson*, we held the trial court did not abuse its discretion in denying Christian's motion for a mistrial because "the trial court below gave a proper curative instruction" and, even in the absence of the improper testimony, "[t]he jury could infer Christian was in custody because the officers arrested him at [the victim's] apartment." *Id.* at 199.

This case is not materially different. Although the trial court correctly noted that Deputy Olson's testimony related to persons in custody "generally in the back of his car," the testimony nonetheless had the potential for prejudice. And while the prosecutor represented to the trial court that she "advised Deputy Olson not to refer to the defendant going into custody or being booked," she violated the court's clear directive that she elicit no more than that Issatayev "was released from the hospital." But the trial court here appropriately offered to give a curative instruction and then gave that instruction at the time and in the manner chosen by the defense. Applying *Chistian* and *Condon*, the two cases cited by the defense in briefing below, the trial court's response to the irregularity and the instruction to disregard it were proper.

We recognize, as Issatayev argues, that some trial errors cannot be cured by instruction. Examples cited by Issatayev include closing argument that the defendant is "strong in" a group that the prosecutor describes as "a deadly group of madmen" and "butchers that kill indiscriminately" (*State v. Belgarde*, 110 Wn.2d 504, 508, 755 P.2d 174 (1988)), testimony that the defendant had sexually abused the victim's sister (*State v. Gogo*, 29 Wn. App. 2d 107, 115-16, 540 P.3d 150 (2023)), and testimony that the defendant has a criminal record and had stabbed someone (*State v. Escalona*, 49 Wn. App. 251, 255-56 742 P.2d 190 (1987)). Deputy Olson's use of the words "prisoner" and "in custody" and his testimony that Issatayev was released back to him are not as serious as the improper argument and testimony in *Belgarde*, *Gogo*, and *Escalona*. And critical here, *Chistian* and *Condon* establish that a curative instruction can be a sufficient remedy short of a mistrial based on the potential prejudice of Deputy Olson's comments. Contrary to Issatayev's argument, *Christian* and *Condon* are controlling here.

Lastly, Issatayev also claims there is a substantial likelihood Deputy Olson's testimony affected the verdict when considered *in combination with* the presence of custody officers in the courtroom. While Issatayev does not claim the presence of custody officers in the courtroom itself amounts to a constitutional violation, he argues their presence, *combined with* Deputy Olson's testimony, prejudiced his right to a fair trial by portraying him as "incarcerated, dangerous, and guilty." But the record reveals only that there were "custody officers in the courtroom sitting in the back area on each side." There is no evidence that there was an unusual number of custody officers, that the custody officers were near Issatayev, or that

they stood next to him while he was testifying. Moreover, the trial court clarified that no restraints were used during the trial and that Issatayev was not handcuffed or shackled. On this record, we cannot conclude that the presence of custody officers in the courtroom combined with Deputy Olson's testimony deprived Issatayev of a fair trial.

III

The alleged irregularity was not so serious that it undermined the fairness of Issatayev's trial, and any prejudice resulting from it was cured by the trial court's instruction. Consequently, Issatayev cannot show he was so prejudiced that nothing short of a new trial could suffice as a remedy. Because the trial court did not abuse its discretion when it denied his second motion for a mistrial, we affirm.

_Feldman, J._

WE CONCUR:

_____        _____